# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Paul E. Plunkett | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 96 C 7680 | **DATE** | 4/25/2000 |
| **CASE TITLE** | JAMES NEWSOME vs. BRUCE JAMES, et al | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] ENTER MEMORANDUM OPINION AND ORDER: there is no genuine issue of material fact on the claims plaintiff asserts against defendants James W. Eckner, Bruce James and David Dioguardi. The motions for summary judgment of those three defendants are, therefore, granted. Plaintiff's motion for summary judgment on Count I and the motions for summary judgment of defendants' James McCabe and Raymond McNally are denied. Defendants' motion to strike paragraphs from plaintiff's Rule 12(M) Statement is granted in part and denied in part. Defendants' motion to strike the July 29, 1999 affidavit of Anthony Rounds is denied. Plaintiff's motion to strike the affidavit of Stephen Meagher is granted. Plaintiff's motion to strike the affidavit of Donald Lantz is granted in part and denied in part.

(11) ■ [For further detail see order attached to the original minute order.]

| No notices required, advised in open court. | | | number of notices | | Document Number |
|---|---|---|---|---|---|
| No notices required. | | | | | |
| Notices mailed by judge's staff. | | | 4-26-00 | | |
| Notified counsel by telephone. | | | date docketed | | |
| ✓ Docketing to mail notices. | | | | | i17 |
| Mail AO 450 form. | | | docketing deputy initials | | |
| Copy to judge/magistrate judge. | | | | | |
| TBK | courtroom deputy's initials | | date mailed notice | | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | | |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

JAMES NEWSOME, )
)
       Plaintiff, )
)
    v. )   No. 96 C 7680
)   Paul E. Plunkett, Senior Judge
BRUCE JAMES, JAMES W. ECKNER, )
DAVID DIOGUARDI, JAMES MCCABE, )
RAYMOND MCNALLY, THEATRICE )
PATTERSON, and OLIVIA RUSSELL, )
)
       Defendants. )

DOCKETED

APR 2 6 2000

## MEMORANDUM OPINION AND ORDER

In his first amended complaint, James Newsome asserts two claims pursuant to 42 U.S.C. § 1983 ("section 1983"). In Count I, which is asserted against James W. Eckner, David Dioguardi, James McCabe and Raymond McNally, plaintiff alleges that defendants violated his Fourth Amendment rights by maliciously prosecuting him. In Count II, which is asserted against all of those defendants and Bruce James as well, plaintiff alleges that defendants conspired to violate his Fourth Amendment rights.[1] Plaintiff has filed a Federal Rule of Civil Procedure 56 motion for summary judgment solely on Count I. Defendants have moved for summary judgment on both counts.[2] In addition, each party has filed motions to strike certain factual submissions of the other. For the reasons set forth below, (1) plaintiff's motion for summary judgment is denied; (2) defendants

---

[1] The claims against defendants Theatrice Patterson and Olivia Russell were dismissed at the end of 1999. (See 12/27/99 Minute Order.)

[2] For reasons that are unclear, the parties filed and briefed their motions separately rather than as cross-motions, a procedure that needlessly multiplies the work of the parties and the Court.

Eckner, Dioguardi and James' motions for summary judgment are granted; (3) defendants McNally and McCabe's motions for summary judgment are denied; (4) defendants' motion to strike paragraphs from plaintiff's Rule 12(M) Statement is granted in part and denied in part; (5) defendants' motion to strike the July 29, 1999 affidavit of Anthony Rounds is denied; (6) plaintiff's motion to strike the affidavit of Stephen Meagher is granted; and (7) plaintiff's motion to strike the affidavit of Donald Lantz is granted in part and denied in part.

## The Motions to Strike

Before we can reach the merits of the summary judgment motions, we must address the motions to strike. Defendants have filed a motion to strike the July 29, 1999 affidavit of Anthony Rounds and a motion to strike various paragraphs of Plaintiff's Local General Rule ("Rule") 12(M) Statement.[3] Plaintiff has filed a motion to strike the affidavits of Stephen B. Meagher and Donald Lantz. We will start with defendants' motions.

## Defendants' Motion to Strike the July 29, 1999 Affidavit of Anthony Rounds

Anthony Rounds was a witness to the murder of Mickey Cohen, the crime for which plaintiff was wrongfully convicted. Defendants contend that Rounds' July 29, 1999 affidavit must be stricken because it tells a tale quite different from the sworn testimony he previously gave at the hearing on plaintiff's motion to suppress line-up identifications, at plaintiff's criminal trial and in a 1998 deposition in this case. At plaintiff's criminal trial, Rounds testified that: he saw plaintiff, who was

---

[3]Effective September 1, 1999, Local General Rule 12 was renumbered LR 56.1. Though all of the briefing took place after that date, the parties submitted some Rule 12 Statements and some LR 56.1 Statements. For clarity, we will refer to the various facts statements as the parties do.

dressed entirely in black, in the produce section of Cohen's grocery store immediately before the murder; he saw the handle of a gun protruding from plaintiff's shirt; shortly thereafter he left the store and heard two shots fired; after hearing the shots he ran back inside the store, collided face-to-face with plaintiff and watched him run down the street; and he subsequently identified plaintiff from a line-up. (Mot. Strike Rounds' 7/29/99 Aff., Ex. B at 917-22, 926-28.) At the suppression hearing, Rounds testified that the police said only one thing to him during the line-up: "Take [your] time, let all of the suspects step forward, and then at the end after [you have seen] the suspects, let . . . [the officer] know." He also testified that the line-up participants did not speak. (Id., Ex. A at 47, 52.) In the 1998 deposition in this case, Rounds testified, albeit in response to leading questions, that his testimony in the criminal trial was truthful, and that the police officers had not told him what to say or whom to pick out of the line-up. (Id., Ex. C at 22-24.)

Rounds' July 29, 1999 affidavit stands in sharp contrast to his prior testimony. In it Rounds states that: he "testified falsely" during plaintiff's criminal trial, he had not seen plaintiff dressed in black in Cohen's store, he did not see the murderer's gun nor did he bump into the murderer as he fled the store. (Id., Ex. D ¶¶ 1-2.) Rather, Rounds claims that he was in the store when the shots were fired, immediately dropped to the floor when he heard them, and saw nothing more than a "shadowy profile" of the murderer as he fled. (Id. ¶ 7.) Rounds says he told the police that he did not get a good look at the murderer, but was asked to view a line-up nonetheless. (Id. ¶ 11.) At the line-up, Rounds now claims, he could not make an identification of either a face or a voice, and repeatedly told that to the police who "constantly" told him that "number 3 [plaintiff] looked and sounded like the gunman." (Id. ¶¶ 12-14.) The testimony he gave at plaintiff's trial, Rounds asserts, "was the creation of the plain clothes police officers" and "was based on what the police told [him] they knew, and not based on what [he] recalled." (Id. ¶¶ 3, 18.)

-3-

Rounds' 2000 deposition did not help clarify the situation. When he was asked whether he had testified truthfully at plaintiff's criminal trial, Rounds said, variously, that he could not remember the trial, he could not remember whether his testimony was truthful, and that he "believe[d]" he had told the truth. (Id., Ex. E at 16-20, 29-30.) Rounds also could not remember his 1998 deposition testimony, though he said he would have answered the deposition questions truthfully. (Id. 25-28.) The only thing Rounds recalled with certainty during his 2000 deposition were the events surrounding Cohen's murder, which he claimed transpired the way they are described in his July 29, 1999 affidavit. (Id. 31-33, 53.)

It is well-settled that parties cannot create sham issues of fact with affidavits that contradict prior sworn statements. Russell v. Acme-Evans Corp., 51 F.3d 64, 67-68 (7th Cir. 1995). Our court of appeals has extended that principle to certain non-party witnesses, but not, as far as we can tell, to *disinterested* witnesses. See Adelman-Tremblay v. Jewel Cos., Inc., 859 F.2d 517, 521 (7th Cir. 1988) ("We can think of no reason, however, not to apply [the sham affidavit] rule to the present case involving the testimony and affidavit of the plaintiff's sole expert witness."); Bank of Illinois v. Allied Signal Safety Restraint Sys., 75 F.3d 1162, 1169-72 (7th Cir. 1996) (applying rule to strike affidavits of mother and step-father of plaintiff). Nor do we believe that it would. The concern that underlies the sham affidavit rule – that parties or witnesses aligned with them can defeat summary judgment on meritless claims by recanting prior sworn statements – is absent in the case of disinterested witnesses. Variations in the testimony of disinterested witnesses, as our court of appeals has noted, raise questions about credibility that must be answered by a jury, not by the Court. Bank of Illinois, 75 F.3d at 1170. Defendants do not suggest that Rounds is anything but a disinterested witness. Consequently, we will not strike his July 29, 1999 affidavit under the sham affidavit rule.

**Defendants' Motion to Strike Various Paragraphs of Plaintiff's Rule 12(M) Statement**

Defendants also move to strike 27[4] of the 57 paragraphs of plaintiff's Rule 12(M) Statement.

Defendants cite no authority for their motion to strike, but we assume it is brought pursuant to LR

56.1, which requires that the fact statements submitted in support of or opposition to summary

judgment motions be supported by "specific references to the affidavits, parts of the record, and other

. . . materials." Though permissible, a motion to strike fact statements is, as plaintiff notes,

"redundant and unnecessary." (Pl.'s Resp. Defs.' Mot. Strike Pl.'s Stmt. Facts at 1.) Defendants

could have achieved the same result, exclusion of unsupported fact statements from consideration

on plaintiff's motion, simply by noting in their response to plaintiff's statement that various asserted

facts were not supported by the record. Having presented the motion, we will decide it, but we

discourage the parties from filing similar motions in the future.

Defendants contend that paragraph 10, which states "James Newsome did not murder Mickey

Cohen" must be stricken because it is not supported by the cited evidence. We disagree. Governor

Edgar's pardon of plaintiff, which he cites to support that paragraph, states in relevant part "Grant

Pardon On Grounds Of Innocence With An Order Permitting An Expungement . . . ." (Pl.'s Rule

12(M) Stmt., Ex. D.) The pardon supports plaintiff's assertion that he did not murder Mickey

Cohen.

Defendants make the same argument with respect to paragraphs 11 and 12, which state,

respectively: "Dennis Emerson, an African-American man who had a long history of armed robbery,

murdered Mickey Cohen" and "In the course of the subject armed robbery, Emerson left his

---

[4]Defendants indicate in the opening portion of their brief that they seek to strike a total of 28 paragraphs: Nos. 10-15, 19-22, 26-28, 32-34, 36, 38-40, 42-43, 45-47, 50, 54 and 57. In the body of the brief, however, they make no argument regarding paragraph 28. Thus, we have not considered it on this motion.

fingerprints on several grocery store items that he touched with his bare hands while at the scene."

Again, we disagree. Emerson's criminal record demonstrates a history of armed robbery, and it is reasonable to infer from the fingerprint report, which shows that Emerson's prints were found at the scene of the murder on items the killer touched with his bare hands, that Emerson robbed and killed Cohen. Paragraphs 11 and 12 will stand.

Defendants move to strike paragraphs 13, 38, 39, 40 and 42 because they are supported solely by Rounds' July 29, 1999 affidavit. Because we did not strike that affidavit, we have no reason to strike the fact statements that are supported by it.

Defendants also contend that the fact statements in paragraphs 14 and 15 and 19-22 are not supported by the evidence cited. The only two facts in paragraph 14 that are supported by the cited evidence is that plaintiff and White are African-American men who were arrested by defendant James on Chicago's north side. (See Pl.'s Rule 12(M) Stmt., Ex. H.) Everything else in that paragraph is stricken. The second sentence of paragraph 15 is not supported by the cited evidence. It is also stricken. The references in paragraph 19 to James and Eckner and the location of White's residence are not supported by the cited evidence and are, therefore, stricken. The specific references to James, Eckner and Dioguardi in paragraph 20, and to Eckner in paragraph 21, are also stricken because they are not supported by the cited evidence. The assertions in paragraph 22, however, are directly supported by or can be reasonably inferred from the cited evidence. Paragraph 22 will stand.

In Paragraph 26, plaintiff asserts that defendants knew on November 1, 1979 that plaintiff's fingerprints did not match those at the crime scene. The April 23, 1985 fingerprint report cited for this fact indicates that the fingerprint comparison was done on November 1, 1979, but does not indicate when any of the defendants became aware of it. (Id., Ex. O, Latent Fingerprint Examination Report.) It is, however, reasonable to infer from this report and the October 30, 1979 police report

prepared by defendants McCabe and McNally, which states that various items at the murder scene "were processed for possible ridge impressions" (id., Ex. C, 10/30/79 Police Report), that the results of the fingerprint comparison were reported to McCabe and McNally, the detectives assigned to the investigation, on November 1, 1979 when it was done. To the extent paragraph 26 imputes knowledge of the comparison to any of the other defendants, it is stricken.

The cite for paragraph 27 establishes that Dennis Emerson's photo should have been in the mug books reviewed by Josie Nash and Anthony Rounds, not that it *was* in those books, as plaintiff asserts. Accordingly, paragraph 27 is stricken.

In paragraphs 32 and 33, plaintiff asserts that the defendants violated Chicago Police Department line-up procedures. Because the cites for those paragraphs do not support that proposition, those paragraphs are stricken.

The evidence cited for paragraph 34 adequately supports the proposition that John Williams gave a description of the killer to Josie Nash and Anthony Rounds while they waited to view the line-up. That portion of the paragraph will stand. In all other respects it is stricken.

The line-up photo establishes that plaintiff was holding a cigarette, but not that the police asked him to hold it or that plaintiff is a non-smoker, as plaintiff asserts. Paragraph 36 is stricken.

Defendants' quarrel with paragraph 43 is, apparently, relevance. The paragraph states that Dennis Emerson was arrested in early 1980 for unlawful use of a weapon, and that the police learned while he was in custody on that charge that Emerson was wanted for a 1979 robbery/murder that occurred less than two miles from the Cohen murder. Though the arrest report that supports this paragraph does not *establish* that the defendants knew Emerson was wanted for a 1979 robbery/murder that occurred near the Cohen murder scene, it is certainly relevant to that issue and will not be stricken.

Defendants seek to strike paragraphs 45 and 46 because they are not supported by the cited evidence. That is not true of paragraph 45, which is directly supported by Emerson's deposition testimony. It is true of paragraph 46, however, which asserts that Emerson filed a motion for a speedy trial on the Cohen murder charge, a fact not found either in the motion or in Emerson's deposition testimony. Paragraph 46 is stricken.

Paragraph 47, which makes a number of allegations about the police department's destruction of Emerson's gun, is unsupported by the record and is stricken.

The citation for paragraph 50 supports the proposition that McNally and McCabe examined plaintiff's residence and found no evidence that linked him to the Cohen murder. It is, in all other respects, stricken.

In paragraph 54, plaintiff relies on a document that bears no indication that it was ever filed, for the proposition that plaintiff filed a Motion for Discharge alleging fraud by the police. Paragraph 54 is stricken.

Paragraph 57, which is adequately supported by McNally's answer to the first amended complaint, will stand.

Finally, defendants ask that Exhibits U and AA to plaintiff's 12(M) Statement, Dennis Emerson's motion for a speedy trial and plaintiff's motion for discharge, respectively, be stricken because these purported court papers are not signed or dated, and bear no indication of ever having been filed. The only materials that can be considered on a summary judgment motion are those of "evidentiary quality." Winskunas v. Birnbaum, 23 F.3d 1264, 1267 (7th Cir. 1994). These unauthenticated, hearsay statements do not meet that standard. They are, therefore, stricken.

**Plaintiff's Motion to Strike the Affidavit of Stephen Meagher**

In support of their motion for summary judgment defendants have submitted the affidavit of Stephen Meagher, a Supervisory Fingerprint Specialist employed by the Federal Bureau of Investigation ("FBI"). Plaintiff claims that Meagher's affidavit must be stricken because it: (1) constitutes undisclosed expert testimony; and (2) is irrelevant to the issues in this case.

In his affidavit, Meagher, who has worked in the FBI's Identification Division continuously since 1972, states that the manual fingerprint classification system used by the FBI in 1979 virtually precluded the FBI from comparing unidentified latent fingerprints submitted to it by a local law enforcement agency to the FBI's fingerprint records. (Meagher Aff. ¶¶ 2-4.) Moreover, Meagher says, even when the FBI's fingerprint system was automated in 1983, "there was no guarantee that use of the FBI's [automated] system would produce . . . the identity of the suspect who left the latent print." (Id. ¶¶ 5-6.) Finally, Meagher says that the fingerprints of Dennis Emerson, the probable killer of Mickey Cohen, were not added to the FBI's system until September 1, 1984, and thus, could not have been identified by the FBI prior to that date. (Id. ¶ 7.)

Though we agree with defendants that Meagher's affidavit constitutes lay, not expert, testimony, we also agree with plaintiff that it is irrelevant to this case. Defendants offer Meagher's affidavit to refute the following fact in Plaintiff's Rule 12(M) Statement: "The Defendants did not send the killer's fingerprints to Washington, D.C. so they could be run through the FBI's fingerprint database or compare the prints to any known violent offenders' on file with the CPD because they already had [plaintiff]." (See Defs.' Resp. Pl.'s Rule 12(M) Stmt. ¶ 49.) Defendants contend that the affidavit is relevant because it shows that it would have been impossible for the FBI to match the Cohen murder scene prints to Dennis Emerson's prints in 1979. But plaintiff offers the statement, which is supported by defendant McNally's deposition testimony, as evidence that defendants made

a deliberate choice not to pursue identification of the fingerprints found at the Cohen murder scene. Meagher's affidavit would be relevant to that issue only if there were evidence that the defendants *knew* it would be futile to send the fingerprints to the FBI. There is not. Accordingly, Meagher's affidavit is stricken and defendants are deemed to have admitted paragraph 49 of plaintiff's Rule 12(M) Statement.

### Plaintiff's Motion to Strike the Affidavit of Donald Lantz

Plaintiff also seeks to strike paragraphs 4-6 of Donald Lantz's affidavit because they are based on inadmissible hearsay. In those paragraphs Lantz, a private investigator who was hired by plaintiff, recounts conversations he had with Josie Nash and Anthony Rounds in July 1988. In essence, Lantz says that both Nash and Rounds denied that anyone coerced them into identifying plaintiff as Cohen's murderer or induced them to testify falsely about their identifications. These statements fall squarely within the definition of hearsay. See FED. R. EVID. 801.

Even so, defendants contend, they are admissible because they fall within the residual exception to the hearsay rule found in Federal Rule of Evidence 807. That rule permits the admission of hearsay statements "not specifically covered by Rule 803 or 804 but having equivalent circumstantial guarantees of trustworthiness" if they are: (1) offered as evidence of a material fact; (2) more probative on the point for which they are offered than any other evidence that the proponent can procure through reasonable efforts; and (3) the general purposes of the Rules of Evidence and the interests of justice will be served by admission of the statements.

The statements of Josie Nash meet these criteria. The fact that these statements are offered by an investigator who was paid by plaintiff, who plainly would have preferred that Nash admit to coercion, provides a circumstantial guarantee of trustworthiness. Nash's statements are offered as

-10-

evidence that the defendants did not coerce her line-up identification, a fact unquestionably material to this litigation. Further, these statements are more probative on this point than any other evidence that the defendants can procure because Nash is dead. Finally, admission of these statements will serve the purposes of the Rules of Evidence and the interests of justice by allowing "Nash" to rebut Rounds' account of the defendants' behavior at the line-up. See FED. R. EVID. 102 (noting that the purpose of the rules is to ascertain the truth and justly determine proceedings).

The statements Lantz attributes to Rounds, however, do not qualify for admission under the residual exception. Unlike Nash, Rounds is very much alive and apparently available to testify in his own words. Though defendants contend that it is "virtually impossible" to secure "reliable, uninfluenced testimony" from Rounds (Defs.' Resp. Mots. Strike at 6), they cite no evidence to support that statement, and it is not a conclusion we can draw from this record. Plainly, Rounds, who admits to certain memory lapses, has changed his story about the events surrounding Mickey Cohen's murder. But that does not necessarily mean that he is unduly susceptible to influence. If defendants believe that Rounds is not competent to testify, they can and should bring that issue to the Court's attention. But defendants stop short of challenging his competency. Instead, they ask us to find that Rounds' criminal trial testimony, his 1998 deposition testimony and his statements to Lantz – in other words, the statements that favor them – are reliable and admissible, and that his July 29, 1999 affidavit and his 2000 deposition testimony – the statements that do not favor them – are unreliable and inadmissible. That we cannot do. Because the statements Rounds allegedly made to Lantz about the line-up are not more probative on that issue than is Rounds' own testimony, they are not admissible under the residual hearsay exception.

Even if Rounds' statements to Lantz are not admissible for the truth of the matter asserted, i.e., that his line-up identification was not coerced, defendants argue that they are admissible to rebut

plaintiff's argument that Rounds gave only two uncoerced statements: his July 29, 1999 affidavit and his 2000 deposition testimony. We agree with defendants that Rounds' statements to Lantz would be admissible for the limited purpose of showing the existence of another uncoerced statement, if that issue were relevant to the summary judgment motions. It is not. Plaintiff's argument that only Rounds' most recent statements were given freely is nothing more than a plea to credit them and disregard the rest. Arguments about the relative worth of Rounds' various statements should be made to a jury at trial, not to the Court at summary judgment. Because the weight of Rounds' testimony is not an issue we will decide on these motions, plaintiff's motion to strike the portion of Lantz's affidavit that recounts his conversations with Rounds is granted.

## Motions for Summary Judgment

Before we reach the substance of the motions, we must address the parties' misunderstanding of the mechanics of LR 56.1. The procedure, as set forth in that rule, is as follows: (1) the moving party must submit a statement of assertedly undisputed facts that entitle it to summary judgment (LR 56.1(a)(3)); (2) the party opposing the motion must submit a statement that responds to each of the moving party's facts (LR 56.1(b)(3)(A)) and, if it wishes, a statement of any additional undisputed facts that the opposing party believes require the denial of summary judgment (LR 56.1(b)(3)(B)); (3) if the party opposing the motion submits a statement of additional facts, then the moving party must submit a reply to those additional fact statements (LR 56.1(a)(3)). No other responses or replies are required or will be considered.

With respect to defendants' motion, defendants submitted a LR 56.1(a)(3) statement of undisputed facts, plaintiff submitted a LR 56.1(b)(3)(A) response and a LR 56.1(b)(3)(B) statement of additional facts, and defendants submitted a LR 56.1(a)(3) reply to the additional facts. In

addition, however, defendants submitted a document in which they "reply" to plaintiff's responses to their statement of undisputed facts (his LR 56.1(b)(3)(A) statement). (See Consolidation Defs.' 56.1(a)(3) Statement Undisputed Material Facts Supp. Mot. Summ. J., Pl.'s 56.1(b) Resp. & Defs.' 56.1(a)(3) Reply.) This additional "reply" is not authorized by LR 56.1 and will not be considered by the Court.

Similarly, with respect to plaintiff's motion, plaintiff submitted a statement of undisputed facts and defendants submitted a response, but they did not submit a statement of additional facts that they believe require denial of the motion. Nonetheless, plaintiff filed a "Reply Statement of Facts." Because defendants did not submit additional facts, plaintiff was not entitled to reply. Therefore, we will disregard plaintiff's reply statement of facts.

## Facts

At about 1:30 p.m., on the afternoon of October 30, 1979, John Williams bumped into a man dressed entirely in black who was talking to two women on Loomis Street in Chicago, in the vicinity of Mickey Cohen's grocery store. (Pl.'s LR 56.1(b) Resp. ¶ 29; Defs.' LR 56.1(a)(3) Stmt., Ex. J, 9/22/80 Crim. Tr. at 531-33.) At about 1:45 p.m., a man dressed entirely in black walked into Mickey Cohen's store, placed a few food items on the counter, and pulled a gun on Cohen. (Pl.'s LR 56.1(b) Resp. ¶¶ 26, 31-33, 40.) Cohen, who had a weapon in his pocket, exchanged fire with the shooter. (Id. ¶¶ 42-44.) Cohen was shot and died of his wounds. (Id. ¶ 26.)

Josie Nash, an employee of Cohen's, was in the store at the time of the shooting. (Id. ¶¶ 30, 46.) Plaintiff contends that Anthony Rounds was also in the store at the time of the shooting, though he did not get a good look at the shooter. (Pl.'s LR 56.1(b) Stmt. Add'l Facts ¶ 4; id., Ex. D, 7/29/99

Rounds Aff., ¶¶ 5-10.) Defendants claim that Rounds left the store just before the shooting began and came back in as the shooter was fleeing. (Defs.' LR 56.1(a)(3) Stmt. ¶¶ 38-39, 47-51.)

Sometime after 2:00 p.m. that day, Willie Smith was standing on Bishop Street, the street immediately west of Loomis, getting tools out of the trunk of his car. (Pl.'s LR 56.1(b) Resp. ¶¶ 52-53; id., Ex. F, 10/31/79 Supp. Report.) A man wearing a black leather jacket and dark trousers ran by Smith, got into an early-1970s model green Ford, and left the area. (Id., Ex. F, 10/31/79 Supp. Report.)

After the shooting, Nash and Rounds went to the police station to look at mug shots. (Id. ¶ 57.) Plaintiff contends both of them identified someone from the mug books. (Pl.'s LR 56.1(b) Resp. ¶ 59; Pl.'s Rule 12(M) Stmt., Ex. M, 6/30/80 Suppression Hr'g Tr. at 20, 22-23.) Defendants say they did not. (Defs.' LR 56.1(a)(3) Stmt. ¶ 59.) It is undisputed, in any event, that plaintiff's photo was not in any of the mug books that Nash and Rounds reviewed. (Defs.' Resp. Pl.'s Rule 12(M) Stmt. ¶ 25.)[5]

Though he now claims that he did not see the shooter's face, Rounds consulted with a police sketch artist to prepare a composite sketch of the shooter. (Pl.'s LR 56.1(b) Resp. ¶ 61.) On October 31, 1979, police officers showed the sketch to Williams, who said the man in the sketch was the one he had bumped into on Loomis Street the previous afternoon. (Defs.' LR 56.1(a)(3) Stmt. ¶¶ 62-

---

[5]The suppression hearing testimony defendants cite to deny this fact actually supports it. (See Defs.' Resp. Pl.'s Rule 12(M) Stmt. ¶ 25.)

63.)[6]  The sketch was placed in the November 1, 1979 Chicago Police Department Daily Bulletin. (Id., Ex. N, 11/1/79 Daily Bulletin.)

On November 1, 1979, James Newsome and Marvin White were arrested by Chicago police officers for the armed robbery of Shirley Wills. (Pl.'s LR 56.1(b) Resp. ¶ 2.)  While they were in custody, defendant Eckner showed defendant James a copy of the November 1, 1979 Daily Bulletin. (Defs.' LR 56.1(a)(3) Stmt. ¶ 65.)[7]  James says he noticed a similarity between the composite and plaintiff. (Defs.' LR 56.1(a)(3) Stmt., Ex. H, James Dep. at 138-39.)  Consequently, either James or his partner contacted Area 2 and told a homicide detective about the resemblance. (Pl.'s LR 56.1(b) Resp. ¶ 68.)

Defendants McCabe, McNally and perhaps Dioguardi picked plaintiff up from the station where he was being held and transported him to Area 2. (Id. ¶¶ 71-72.)  McNally and McCabe interrogated plaintiff and then left to gather witnesses for a line-up. (Id. ¶ 73.)

At about 12:30 p.m. on November 1, 1979, plaintiff was taken from Area 2 to the 5th District for the line-up. (Id. ¶ 74.)  Detective Laverty conducted the line-up. (Id. ¶ 75.)  McCabe and McNally were in and out of the room when the witnesses were brought in for the line-up. (Id. ¶ 78.)

Rounds, Nash and Williams went to the 5th District to view the line-up. (Id. ¶ 79.)  The parties dispute whether they discussed the killer's description while they waited to view the line-up

---

[6]Plaintiff's attempts to deny these facts fail.  Even if true, the fact that Williams was shown a picture of plaintiff shortly before the line-up on November 1, 1979 does not discredit Williams' testimony that he was shown a composite sketch on October 31, 1979. (Compare Pl.'s LR 56.1(b) Resp. ¶ 62 with Defs.' LR 56.1(a)(3) Stmt. ¶ 62.)  Similarly, the fact that Williams told a police officer on October 30, 1979 that he "saw or heard nothing" with respect to the shooting does not negate his testimony that when he was shown the composite sketch the next day he recognized the man depicted in it as the one he had bumped into on Loomis Street the previous afternoon. (Compare Pl.'s LR 56.1(b) Resp. ¶ 63 with Defs.' LR 56.1(a)(3) Stmt. ¶ 63.)

[7]Though plaintiff denies other aspects of this fact statement, he does not contest the fact that Eckner showed the bulletin to James. (See Pl.'s LR 56.1(b) Resp. ¶ 65.)

and whether they viewed the line-up singly or together. (Compare Pl.'s Rule 12(M) Stmt. ¶ 34,[8] 38

with Defs.' LR 56.1(a)(3) Stmt. ¶¶ 81-82.) Plaintiff claims that Rounds and Nash, who viewed the

line-up together, were repeatedly encouraged by the police to identify plaintiff as the killer. (Pl.'s

Rule 12(M) Stmt. ¶ 40.) Defendants claim that none of the police officers told Rounds whom to

choose. (Defs.' LR 56.1(a)(3) Stmt. ¶ 86.) Whether they did so freely or under duress, Nash and

Rounds identified plaintiff as the killer from the line-up. (Pl.'s Rule 12(M) Stmt. ¶¶ 40, 42; Defs.'

LR 56.1(a)(3) Stmt. ¶ 85.[9]) Williams identified plaintiff as well. (Defs.' LR 56.1(a)(3) Stmt. ¶ 87.)[10]

Each testified about their line-up identification during plaintiff's criminal trial. (Id., Ex. J, 9/22/80

Crim. Tr. at 539, 880, 927-28.)

At some point on November 1, 1979, defendants McNally and McCabe searched plaintiff's

house, but found no evidence that linked him to the Cohen murder. (Pl.'s Rule 12(M) Stmt. ¶ 50;

id., Ex. X, 11/1/79 Police Report.) They also learned, on that date, that plaintiff's fingerprints did

not match those found at the crime scene. (Pl.'s Rule 12(M) Stmt. ¶ 26; id., Ex. O, 4/23/85 Latent

---

[8]Contrary to defendants' claim, this portion of the fact statement is adequately supported by the record. (See Defs.' Resp. Pl.'s Rule 12(M) Stmt. ¶ 34.)

[9]Plaintiff's attempt to deny that Nash identified him from the line-up fails. The only support plaintiff cites for that denial is Rounds' July 29, 1999 affidavit in which Rounds states that he does not know whether Nash made an identification. (See Pl.'s LR 56.1(b) Resp. ¶ 85; id., Ex. E, 7/29/99 Rounds Aff. ¶ 17.)

[10]Plaintiff attempts to deny this fact by citing to Rounds' July 29, 1999 affidavit. (See Pl.'s LR 56.1(b) Resp. ¶ 87.) Rounds, however, says nothing about Williams in that affidavit. (See id., Ex. E.)

Fingerprint Examination Report.)[11] Despite the dearth of physical evidence, plaintiff was arrested for Cohen's murder the same day. (Id., Ex. X, 11/1/79 Police Report.)

On September 26, 1980 plaintiff was convicted of murdering Cohen. (Id., Ex. Y, 9/26/80 Crim. Tr. at 1316.) On July 14, 1995, after spending fifteen years in prison, Governor Edgar granted him a pardon on the grounds of innocence. (Id., Ex. D, Pardon.)

## The Legal Standard

To prevail on a summary judgment motion, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, [must] show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). At this stage, we do not weigh evidence or determine the truth of the matters asserted. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). We view all evidence and the inferences from it in the light most favorable to the non-moving party. Karazanos v. Navistar Int'l Transp. Corp., 948 F.2d 332, 335 (7th Cir. 1991) (citing Lohorn v. Michal, 913 F.2d 327, 331 (7th Cir. 1990)). "Summary judgment is only appropriate when the record reveals that no reasonable jury could find for the nonmoving party." Karazanos, 948 F.2d at 335 (citing Doe v. Allied Signal, Inc., 925 F.2d 1007, 1008 (7th Cir. 1991)).

---

[11]Defendants attempt to deny this fact because the fingerprint report on which it is based is dated April 23, 1985 and does not specifically mention any of the defendants. (Defs.' Resp. Pl.'s Rule 12(M) Stmt. ¶ 26.) The report, however, states that the comparison of plaintiffs' fingerprints to those found at the scene was made on November 1, 1979. (Pl.'s Rule 12(M) Stmt., Ex. O, 4/23/85 Latent Fingerprint Examination Report.) Moreover, the original report on the murder, prepared by McCabe and McNally, states that various items at the murder scene were "processed for possible ridge impressions." (Id., Ex. C, 10/30/79 Police Report.) Contrary to defendants' claim, it is reasonable to infer from these facts that the results of the fingerprint comparison requested by McCabe and McNally, the detectives who were assigned to the case and arrested plaintiff for the murder, were reported to them as soon as they were available.

## Count I

In Count I, plaintiff asserts a section 1983 malicious prosecution claim against defendants Eckner, Dioguardi, McCabe and McNally.[12] The elements of a section 1983 malicious prosecution claim are: (1) the requirements of a state law cause of action for malicious prosecution are satisfied; (2) a state actor committed the malicious prosecution; and (3) plaintiff was deprived of liberty. Cervantes v. Jones, 188 F.3d 805, 809 (7th Cir. 1999) (citations omitted), cert. denied, 120 S. Ct. 1159 (2000). To satisfy the requirements of a malicious prosecution claim under Illinois law, plaintiff must show that defendants maliciously instituted or continued judicial proceedings against him, for which there was no probable cause, the proceedings were terminated in his favor and he was injured. Id. Only two of these elements are in dispute: (1) whether there was probable cause for the prosecution of plaintiff; and (2) whether defendants maliciously instituted or continued the judicial proceedings against him. To defeat defendants' motion, plaintiff must produce evidence to suggest both that defendants lacked probable cause for the prosecution and that they pursued it with malice. Defendants, on the other hand, can defeat plaintiff's motion by producing evidence that suggests either of these elements is lacking. We will start with probable cause.

Probable cause is a "practical, nontechnical conception" that requires an "evaluation of the totality of the circumstances." United States v. Rucker, 138 F.3d 697, 700 (7th Cir. 1998) (internal quotation marks and citations omitted). "Probable cause for an arrest exists if, at the time the arrest was made, the facts and circumstances within the police officers' knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent person to believe that an

---

[12]In 1997, we dismissed the malicious prosecution claim against defendant James. (See 6/30/97 Minute Order.)

offense was committed." Simkunas v. Tardi, 930 F.2d 1287, 1291 (7th Cir. 1991). As Judge Shadur

has noted, however, "the existence of probable cause for an arrest does not automatically translate

into probable cause for the ensuing criminal proceeding." Nielsen v. Village of Lake in the Hills,

948 F. Supp. 786, 796 (N.D. Ill. 1996). Though an arrest may be supported by probable cause,

subsequently discovered exculpatory evidence might vitiate probable cause for the trial. Id. Thus,

to determine whether there was probable cause to prosecute plaintiff, we must consider both the facts

on which the arrest was based, and those that came to light between the arrest and the trial.

The parties agree that plaintiff's arrest on the murder charge was based primarily on the line-

up identifications made by Nash and Rounds. They disagree, however, on the validity of those

identifications. Plaintiff asserts that they were the product of police coercion; defendants claim they

were made without police interference. (Compare Defs.' LR 56.1(a)(3) Stmt. ¶¶ 85-86 with Pl.'s

LR 56.1(b) Stmt. Add'l Facts ¶¶ 17-19.) It is not the Court's province to decide this factual dispute.

And, as discussed below, we cannot decide the probable cause issue without doing so.

Viewing the facts in the light most favorable to defendants, as we must for the purposes of

plaintiff's motion, we cannot say as a matter of law that there was no probable cause to prosecute

plaintiff. There are a few undisputed exculpatory facts: (1) McCabe and McNally's knowledge that

plaintiff's fingerprints did not match those at the murder scene (Pl.'s Rule 12(M) Stmt. ¶ 26; id., Ex.

O, 4/23/85 Latent Fingerprint Examination Report)[13]; (2) the fact that their search of plaintiff's home

turned up nothing that connected him to the murder (Id., Ex. X, 11/1/79 Police Report); (3) the fact

that John Williams viewed a photo array he thought was suggestive before identifying plaintiff as

the man he saw on Loomis Street shortly before the murder (Pl.'s LR 56.1(b) Resp. ¶ 27; Defs.' LR

---

[13]See n.11.

56.1(a)(3) Stmt., Ex. J., 9/22/80 Crim. Tr. at 545-49); and (4) the fact that Willie Smith was only shown one green Ford, plaintiff's, by the police before he identified it as being the same color and type as the one he saw leaving Bishop Street after the murder (Pl.'s LR 56.1(b) Resp. ¶ 88; Defs.' LR 56.1(a)(3) Stmt., Ex. J, 9/22/80 Crim. Tr. at 960-61). But those facts are not sufficient to vitiate the probable cause created by the undisputed inculpatory facts: Williams' identification of plaintiff (Pl.'s LR 56.1(b) Resp. ¶ 87)[14] and Smith's identification of plaintiff's car (id. ¶¶ 53-55, 88), and the disputed inculpatory facts that we must construe in defendants' favor: Nash and Rounds' line-up identifications of plaintiff (Defs.' LR 56.1(a)(3) Stmt. ¶¶ 85-86), Nash and Rounds' failure to identify the killer from mug books that did not contain plaintiff's picture (Defs.' LR 56.1(a)(3) Stmt. ¶¶ 57-59; Pl.'s Rule 12(M) Stmt. ¶ 25 ) and plaintiff's resemblance to the composite sketch (Defs.' LR 56.1(a)(3) Stmt. ¶ 66).

Similarly, when we view the facts in plaintiff's favor, as we must on defendants' motion, we cannot say that there was probable cause to prosecute. Taken together, the undisputed inculpatory facts, Williams' identification of plaintiff (Pl.'s LR 56.1(b) Resp. ¶ 87)[15] and Smith's identification of plaintiff's car (id. ¶¶ 53-55, 88), the undisputed exculpatory facts Williams' belief that the photo array was suggestive (id. ¶ 27; Defs.' LR 56.1(a)(3) Stmt., Ex. J., 9/22/80 Crim. Tr. at 545-49), the single green Ford shown to Smith (Pl.'s LR 56.1(b) Resp.¶ 88; Defs.' LR 56.1(a)(3) Stmt., Ex. J, 9/22/80 Crim. Tr. at 960-61), the absence of plaintiff's prints from the murder scene (Pl.'s Rule 12(M) Stmt. ¶ 26; id., Ex. O, 4/23/85 Latent Fingerprint Examination Report)[16] and the negative search of plaintiff's home (id., Ex. X, 11/1/79 Police Report), and the disputed exculpatory

---

[14]See n.10.

[15]See n.10.

[16]See n.11.

facts that we must construe in plaintiff's favor, the coercion of Nash and Rounds' line-up identifications (id. ¶¶ 39-41), their identifications of the killer from mug books that did not contain plaintiff's picture (id. ¶¶ 24-25) and plaintiff's resemblance to a composite sketch that was based on input from Rounds, who now says he never saw the killer's face (Defs.' LR56.1(a)(3) Stmt. ¶ 61; Pl.'s LR 56.1(b) Resp. Ex. E, Rounds' 7/29/99 Aff. ¶ 10), are not, as a matter of law, sufficient to make a prudent person believe that plaintiff murdered Mickey Cohen.

Having lost on the facts, plaintiff turns to the law. According to plaintiff, collateral estoppel establishes that there was no probable cause to prosecute him because a state court determined defendants procured his conviction by fraud when it granted his motion for discharge. We disagree.

We must give the same preclusive effect to an Illinois state court judgment as it would be given by an Illinois court. Migra v. Warren City Sch. Dist. Bd. of Educ., 465 U.S. 75, 81-83 (1984). The elements of collateral estoppel under Illinois law are: (1) the issue decided in the prior action is identical to the one currently presented; (2) a court of competent jurisdiction rendered a final judgment on the merits in the prior action; (3) the party against whom the doctrine is asserted was a party to the prior action or in privity with a party; (4) the issue was actually and necessarily litigated and determined in the prior action; and (5) the party to be estopped had a full and fair opportunity to litigate the issue in the prior proceeding. Talarico v. Dunlap, 281 Ill. App. 3d 662, 665, 667 N.E.2d 570, 572, 217 Ill. Dec. 481, 483 (1st Dist. 1996).

Even if we assume that the state court determined the probable cause issue when it granted plaintiff's motion for discharge, a fact not established by the record, the doctrine of collateral estoppel would still not apply because there is no evidence that defendants had a full and fair opportunity to litigate the issue in state court. It is undisputed that the state court granted plaintiff's motion for discharge without objection from the State's Attorney on January 4, 1995. (Pl.'s Rule

12(M) Stmt., Ex. BB, 1/4/95 Hr'g Tr. at 4.) But the record does not reveal whether any of the defendants testified during the hearing on that motion or whether they otherwise had an opportunity to defend their probable cause determination during that proceeding. Because there is no evidence that defendants had a full and fair opportunity to litigate the probable cause issue in the state court proceeding, they are not collaterally estopped from litigating it here.

Defendants have another weapon in their probable cause arsenal as well: qualified immunity. Qualified immunity protects government officials from liability as long as their conduct "does not violate clearly established rights of which a reasonable person would have known." Wollin v. Gondert, 192 F.3d 616, 622 (7th Cir. 1999) (internal quotation marks and citation omitted). As defendants concede, the "right of freedom from arrest without probable cause is beyond a doubt clearly established." (Defs.' Mem. Supp. Mot. Summ. J. at 8 (internal quotation marks and citations omitted).) In the probable cause context, defendants are entitled to qualified immunity if a reasonable officer, in light of the information available to the defendants at the time of plaintiff's arrest, could have believed that there was probable cause to arrest. Wollin, 192 F.3d at 622.

Defendants claim a reasonable officer could have believed there was probable cause to arrest plaintiff because there were "three eye witnesses who [sic] combined testimony established Newsome as the murderer." (Defs.' Mem. Supp. Mot. Summ. J at 8.) When we view the facts in the light most favorable to plaintiff, however, we must conclude that the defendants knew when they arrested him that the line-up identifications of Rounds and Nash, the only two witnesses who actually saw the killer, were coerced. (See generally, Pl.'s LR 56.1(b) Resp., Ex. E, Rounds' 7/29/99 Aff.) Eliminating Nash and Rounds' identifications leaves Williams' identification of plaintiff, Smith's identification of plaintiff's car, the negative search of plaintiff's home and the fact that plaintiff's fingerprints did not match those at the murder scene. No reasonable officer could have believed

there was probable cause to arrest plaintiff for Cohen's murder based on the fact that Williams saw

plaintiff chatting with two women in the vicinity of Cohen's store shortly before the murder and

Smith saw a car like plaintiff's leave the area *more than fifteen minutes* after the murder when

plaintiff's fingerprints were not found at the murder scene and no evidence to connect him to the

crime was found at his home. Accordingly, defendants are not entitled to qualified immunity on the

malicious prosecution claim.[17]

To summarize, we cannot determine as a matter of law, whether defendants did or did not

have probable cause to arrest and prosecute plaintiff. Because the lack of probable cause is an

essential element of plaintiff's malicious prosecution claim, his motion for summary judgment on

Count I is denied.

Defendants, however, can still prevail on their motion if the record establishes, as a matter

of law, that they did not maliciously institute or continue judicial proceedings against plaintiff.

Malice in this context, means improper acts committed by the defendants after plaintiff was arrested.

Reed v. City of Chicago, 77 F.3d 1049, 1053 (7th Cir. 1996).

There is nothing in the record that demonstrates malice on the part of defendants Eckner and

Dioguardi. Even viewed favorably to plaintiff, the record reveals that the only role Eckner played

in the prosecution of plaintiff was suggesting to defendant James that plaintiff resembled the

---

[17]Quoting Williams v. Heavner, No. 97 C 0890, 1999 WL 91885, at *4 (N.D. Ill. Feb. 10, 1999), defendants argue that "'the law on whether malicious prosecution gives rise to a constitutional violation was not clearly established'" in 1979. (Defs.' Reply Mem. Supp. Mot. Summ. J. at 7.) In reality, as the Williams court noted, it was established in 1979 in this circuit that malicious prosecution was actionable under section 1983 if it resulted in a "deprivation of constitutional magnitude," as it did here. Hampton v. Hanrahan, 600 F.2d 600, 630 (7th Cir. 1979), rev'd in part on other grounds, 446 U.S. 754 (1980); Williams, 1999 WL 91885 at *4.

composite sketch of Cohen's murderer. (Defs.' LR 56.1(a)(3) Stmt. ¶ 65.)[18] Similarly, the record shows that Dioguardi did nothing more than accompany McCabe and McNally from Area 2 to the police station at which plaintiff was being held on the Wills robbery. (Pl.'s LR 56.1(b) Resp. ¶ 71.) Because there is no evidence to suggest that defendants Eckner and Dioguardi engaged in any improper conduct after plaintiff was arrested for Cohen's murder, their motions for summary judgment on Count I are granted.

The same is not true for defendants McCabe and McNally. It is undisputed that these defendants gathered the witness for the line-up and were in and out of the room when Rounds and Nash were viewing it. (Pl.'s LR 56.1(b) Resp. ¶¶ 73, 78.) In his July 29, 1999 affidavit, which for the purposes of defendants' motion we must accept as true, Rounds claims that the officers in the room repeatedly encouraged him and Nash to identify plaintiff as the murderer. (Id., Ex. E, 7/29/99 Rounds' Aff. ¶¶ 11-16.) It is reasonable to infer from these facts, as we must on summary judgment, that the officers who encouraged Nash and Rounds to identify plaintiff were McCabe and McNally. Though defendants' line-up conduct occurred before plaintiff was arrested for Cohen's murder, it was the basis for Nash and Rounds' testimony at plaintiff's criminal trial that he was the man they saw murder Mickey Cohen. Suborning perjury is sufficient to demonstrate malice. Moreover, these officers' undisputed decision not to pursue identification of the crime scene fingerprints with the FBI also suggests malice. (Pl.'s Rule 12(M) Stmt. ¶ 49; supra, at 10.) Because there is evidence in the record from which a jury could infer that McCabe and McNally maliciously continued the judicial proceedings against plaintiff, their motion for summary judgment on Count I is denied.

---

[18]Plaintiff tries to deny this fact, but the denial does not controvert the substance of the asserted fact. (See Pl.'s LR 56.1(b) Resp. ¶ 65.)

**Count II**

In Count II of his first amended complaint, plaintiff alleges that all of the remaining defendants, James, Eckner, Dioguardi, McCabe and McNally, are liable under section 1983 for conspiring to violate his Fourth Amendment rights. Defendants contend that the intracorporate conspiracy doctrine shields them from this claim. The Seventh Circuit first explained this doctrine in <u>Dombrowski v. Dowling</u>, 459 F.2d 190, 196 (7th Cir. 1970). In that case, the plaintiff sued a real estate company and one of its building managers under section 1985 for conspiring to deprive him of his Fourteenth Amendment rights. The district court entered judgment for the plaintiff, but the Seventh Circuit reversed, saying:

> the statutory requirement that "two or more persons . . . conspire or go in disguise on the highway," is not satisfied by proof that a discriminatory business decision reflects the collective judgment of two or more executives of the same firm. . . . [I]f the challenged conduct is essentially a single act of discrimination by a single business entity, the fact that two or more agents participated in the decision or in the act itself will normally not constitute the conspiracy. . . .

<u>Id.</u> at 196. In <u>Wright v. Illinois Dep't Children & Family Servs.</u>, 40 F.3d 1492 (7th Cir. 1994), the Seventh Circuit extended the intracorporate conspiracy doctrine to section 1985 claims asserted against individual members of a single governmental entity because "large, bureaucratic agencies such as the DCFS are functionally the equivalent of corporations in that their employees and officials jointly endeavor to provide a product or service and reach decisions pursuant to a unified, hierarchical structure." <u>Id.</u> at 1508. In the court's view, "except in egregious circumstances, intra-entity discussions that result in discriminatory or retaliatory actions lie outside the scope of § 1985." <u>Id.</u> at 1508-09.

The Seventh Circuit has not, however, held that the intracorporate conspiracy doctrine is applicable to section 1983 cases. But <u>see</u> <u>Jones v. City of Chicago</u>, 856 F.2d 985, 992-93 (7th Cir.

1988) (affirming section 1983 conspiracy verdict against various police officers without any discussion of intracorporate conspiracy doctrine). Nor, as far as we can tell, has any other circuit court of appeal. Some judges in this district have held that the doctrine applies to section 1983 cases, see, e.g., Rojicek v. Community Consol. Sch. Dist. 15, 934 F. Supp. 280, 281 (N.D. Ill. 1996) (J. Alesia); David v. Village of Oak Lawn, No. 95 C 7368, 1996 WL 210072, at *4 (N.D. Ill. Apr. 29, 1996) (J. Gettleman); Chavez v. Illinois State Police, No. 94 C 5307, 1996 WL 66136, at *7-8 (N.D. Ill. Feb. 13, 1996) (J. Manning), though three have refused to apply it to section 1983 cases involving police misconduct, see Northen v. City v. of Chicago, No. 93 C 7013, 1999 WL 342441, at *4 (N.D. Ill. May 17, 1999) (J. Holderman); Cooper v. Harris, Nos. 98 C 1623 & 98 C 1624, 1999 WL 261742, at *3 (N.D. Ill. Apr. 13, 1999) (J. Grady); Salto v. Mercado, No. 96 C 7168, 1997 WL 222874, at *1 (N.D. Ill. Apr. 24, 1997) (J. Zagel).

After reviewing the history of the doctrine, we agree with Judges Holderman, Grady and Zagel that the intracorporate conspiracy doctrine does not shield defendants from section 1983 conspiracy claims based on the kind of police misconduct alleged here. The intracorporate conspiracy doctrine was created to shield corporations and their employees from conspiracy liability for routine, collaborative business decisions that are later alleged to be discriminatory. The conduct plaintiff challenges here does not fit that mold. The decision to frame plaintiff for Cohen's murder, as plaintiff alleges it, is not the product of routine police department decision-making. Rather, it is, as Judge Zagel put it, "a classic charge of conspiracy" in which "a number of officers took concerted action . . . to harm a single individual." Salto, 1997 WL 222874 at *1. If the facts bear out plaintiff's version of events, the intracorporate conspiracy doctrine will not shield defendants from his conspiracy claim.

A conspiracy exists if there are "(1) an express or implied agreement among defendants to deprive plaintiff of his . . . constitutional rights and (2) actual deprivations of those rights in the form of overt acts in furtherance of the agreement." Scherer v. Balkema, 840 F.2d 437, 442 (7th Cir. 1988). Plaintiff argues that both elements are satisfied by Marvin White's testimony that he "witnessed Defendants Dioguardi, James and Eckner discussing how they intended to take plaintiff 'down' because 'if he didn't kill Cohen, he killed somebody.'" (Pl.'s Mem. Resp. Defs.' Mot. Summ. J. at 11.) There are two problems with this claim. First, White never identified the officers about whom he testified. Rather, he said he heard a police officer, who "sounded like the guy with the white hair," tell two other unidentified officers, that plaintiff is "going down" because "if he didn't kill Cohen, he killed somebody." (Pl.'s Rule 12(M) Stmt., Ex. K, White Dep. at 23-24.) Because plaintiff did not provide us with any facts from which we could infer the identities of those officers, we struck from plaintiff's Rule 12(M) fact statement concerning White's testimony the references to specific officers. (See id. ¶ 20; supra, at 6.) Second, even if there were proof that the "guy with the white hair" was Eckner and that he made those comments to James and Dioguardi, it would not save plaintiff's conspiracy claim because there is no evidence that James and Dioguardi agreed that the Cohen murder should be pinned on plaintiff. White testified that one officer spoke and the other two listened, not that the latter two officers said or did anything to indicate that they agreed plaintiff should be railroaded for Cohen's murder. Because there is no evidence that Dioguardi, James and Eckner agreed to violate plaintiff's rights, they are entitled to summary judgment on the conspiracy claim asserted against them in Count II.

Once again, however, the situation is different for McCabe and McNally. Viewing the record in the light most favorable to plaintiff, there are facts from which a jury could conclude that these two defendants agreed to violate plaintiff's rights and took steps to do so, including: (1) the fact that

McCabe and McNally were in and out of the room when Nash and Rounds were viewing the line-up (Pl.'s LR 56.1(b) Resp. ¶ 78); (2) Rounds' testimony that the officers in that room repeatedly encouraged him and Nash to identify plaintiff as the murderer (Id., Ex. E, 7/29/99 Rounds' Aff. ¶¶ 11-16); (3) Williams' testimony that the photo array the "plain clothes men" showed him was suggestive (Pl.'s LR 56.1(b) Resp. ¶ 27; Defs.' LR 56.1(a)(3) Stmt., Ex. J., 9/22/80 Crim. Tr. at 545-49); (4) Smith's testimony that the police showed him only one green Ford, plaintiff's, before he identified it as being the same color and type as the one he saw leaving Bishop Street shortly after the murder (Pl.'s LR 56.1(b) Resp. ¶ 88; Defs.' LR 56.1(a)(3) Stmt., Ex. J, 9/22/80 Crim. Tr. at 960-61); and (5) McNally's testimony that he did not ask the Chief of Detectives to send the murder scene fingerprints, which he knew did not match plaintiff's, to Washington for comparison with those on file with other government agencies because "[he] felt [he] had [the] guy" (Pl.'s Rule 12(M) Stmt., Ex. L, McNally Dep. at 230–31). Because there is sufficient evidence from which a jury could conclude that McCabe and McNally conspired to violate plaintiff's Fourth Amendment rights, their motion for summary judgment on this claim is denied.

## Conclusion

For the reasons set forth above, there is no genuine issue of material fact on the claims plaintiff asserts against defendants James W. Eckner, Bruce James and David Dioguardi. The motions for summary judgment of those three defendants are, therefore, granted. Plaintiff's motion for summary judgment on Count I and the motions for summary judgment of defendants' James McCabe and Raymond McNally are denied. Defendants' motion to strike paragraphs from plaintiff's Rule 12(M) Statement is granted in part and denied in part. Defendants' motion to strike the July 29, 1999 affidavit of Anthony Rounds is denied. Plaintiff's motion to strike the affidavit of Stephen Meagher is granted. Plaintiff's motion to strike the affidavit of Donald Lantz is granted in part and denied in part.

ENTER:

_____
**UNITED STATES DISTRICT JUDGE**

DATED: _4-25-00_