# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Paul E. Plunkett | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 96 C 7680 | **DATE** | 4/2/2002 |
| **CASE TITLE** | JAMES NEWSOME vs. JAMES MCCABE, et al | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] ENTER MEMORANDUM OPINION AND ORDER: Defendants' Rule 50(b) motion for judgment as a matter of law, or in the alternative, Rule 59(e) motion for a new trial is denied. This is a final and appealable order.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | **Document Number** |
| | No notices required. | number of notices | |
| | Notices mailed by judge's staff. | | 276 |
| | Notified counsel by telephone. | APR 04 2002 date docketed | |
| ✓ | Docketing to mail notices. | cm docketing deputy initials | |
| | Mail AO 450 form. | | |
| | Copy to judge/magistrate judge. | date mailed notice | |
| TBK | courtroom deputy's initials | | |
| | | Date/time received in central Clerk's Office | mailing deputy initials |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| JAMES NEWSOME, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 96 C 7680 |
| | ) | Paul E. Plunkett, Senior Judge |
| JAMES MCCABE and RAYMOND | ) | |
| MCNALLY, | ) | |
| | ) | |
| Defendants. | ) | |

DOCKETED

APR 0 4 2002

## MEMORANDUM OPINION AND ORDER

The case is before the Court on defendants' Federal Rule of Civil Procedure 50(b) motion for judgment as a matter of law or, in the alternative, Rule 59 motion for a new trial. For the reasons set forth below, the motion is denied.

## The Legal Standard

Judgment as a matter of law is proper only when the evidence and all reasonable inferences drawn from it are insufficient to support the verdict when viewed in the light most favorable to the prevailing party. Cygnar v. City of Chicago, 865 F.2d 827, 834 (7th Cir. 1989.) In deciding the motion, the Court may not "resolve conflicts in testimony or weigh and evaluate the evidence." Id. (internal quotation marks and citation omitted). "If the evidence, taken as a whole, provides a sufficient probative basis upon which a jury could reasonably reach a verdict," the motion must be denied. Id. (internal quotation marks and citation omitted).

A Rule 59 motion for a new trial should be granted if "the verdict is against the weight of the evidence, . . . the damages are excessive, or . . . the trial was [otherwise] not fair to the moving

party." Id. at 835 (internal quotation marks and citation omitted). The motion can also be granted on the grounds of newly discovered evidence if the evidence: (1) existed at the time of trial, but was not discovered until after the trial was completed; (2) could not have been discovered before trial through the exercise of due diligence; (3) is admissible, credible, and material; (4) is not cumulative or impeaching; and (5) is likely to change the result of the trial. Mumford v. Bowen, 814 F.2d 328, 330 (7th Cir. 1986) (setting forth elements in the context of a Rule 60(b) motion); see Peacock v. Board of Sch. Comm'rs of Indianapolis, 721 F.2d 210, 213 (7th Cir. 1983) (*per curiam*) (noting that "the same criteria apply in evaluating 'new evidence' offered under" Rules 59 and 60).

## Discussion

Defendants argue that the evidence adduced at trial shows that they are entitled to qualified immunity. Defendants are entitled to qualified immunity if their conduct "does not violate clearly established rights of which a reasonable person would have known." Wollin v. Gondert, 192 F.3d 616, 622 (7th Cir. 1999) (internal quotation marks and citation omitted). Defendants argue that, at the time of Newsome's arrest and trial, police officers did not have a clearly established duty to refrain from concealing exculpatory evidence from the prosecutor. Our court of appeals, however, rejected this argument when it decided defendants' interlocutory appeal. In the words of the court: "[W]as it clearly established in 1979 and 1980 that police could not withhold from prosecutors exculpatory information about fingerprints and the conduct of a lineup? The answer is yes." Newsome v. McCabe, 256 F.3d 747, 752 (7th Cir. 2001) (citations omitted). Given that holding, defendants are entitled to qualified immunity only if the evidence presented at trial did not establish that they withheld material, exculpatory information.

Viewed favorably to Newsome, as it must be, the evidence is sufficient to overcome a qualified immunity defense. Anthony Rounds, who identified Newsome from a lineup in 1979, said that he identified Newsome only because defendants told him to do so. (R. at 190-93.) This is not the kind of evidence that "would have come out as soon as the prosecutors asked [the police] (or as soon as defense counsel interviewed the police or questioned them on the stand)," and thus, it supports Newsome's due process claim. Newsome v. McCabe, 260 F.3d 824, 825 (7th Cir. 2001) (per curiam). Because Rounds' testimony, if credited by the jury, is sufficient to establish that defendants withheld material, exculpatory information from the prosecutors, they are not entitled to judgment as a matter of law on the grounds of qualified immunity.

Defendants also argue that they are entitled to absolute witness or prosecutorial immunity from Newsome's claims. As we said in our opinion on defendants' motion to assert these defenses, absolute witness immunity shields them from due process claims based on their own perjury, their subornation of perjury, or their conspiracy to present perjured testimony. (See 10/15/01 Mem. Op. & Order at 6-7.) It does not, however, protect them from due process claims based on their procurement of Rounds' misidentification of Newsome, a separate constitutional violation. Moreover, for the reasons set forth in our opinion on defendants' motion to assert additional affirmative defenses, we again reject their contention that they are entitled to absolute prosecutorial immunity from Newsome's claims. (See id. at 7-10.)

Even if they are not immune from Newsome's claims, defendants contend that they are still entitled to judgment as a matter of law because there was insufficient evidence to support the verdict. Judgment must be entered in their favor, defendants say, because: (1) Rounds' testimony was incredible; (2) even if it were worthy of credence, it does not support the inference that defendants were the officers who behaved improperly at the lineup; and (3) even if it were credible and

implicated defendants, the evidence was available to the defense through the exercise of reasonable diligence, and thus, was not suppressed.[1] The Court disagrees with each contention.

First, viewed in light of all of the other evidence presented at trial, we cannot say that no reasonable jury could credit Rounds' testimony. Certainly, Rounds' prior inconsistent statements damage his credibility. But there is other evidence that bolsters it, including: (1) Dr. Wells' testimony that it is extremely unlikely that all three witnesses mistakenly identified Newsome (R. at 48-58); (2) Newsome's testimony that he saw defendants gesture to him when Josie Nash was viewing the lineup (id. at 539); (3) John Williams' testimony that he was shown a suggestive photo array containing Newsome's picture before he viewed the lineup (id. at 110-14); and (4) defendant McNally's testimony that it is improper to show a witness a photo array before they view a lineup and that such a deviation from procedure should have been noted in the police reports about the Cohen murder (id. at 405-07). Given this other evidence, it was not wholly unreasonable for the jury to credit Rounds' testimony, despite its inconsistency with his prior statements.

The evidence was also sufficient to enable the jury to infer that the police officers who Rounds said influenced his identification were the defendants. Though Rounds did not identify the officers by name, Newsome testified that both defendants were present at the lineup (id. at 554), defendant McNally testified that he was present at the lineup (id. at 396-97, 409), defendant McCabe

---

[1]Defendants also say that the evidence was insufficient to prove that "[d]efendants engaged in any conduct that was calculated to prevent [Rounds] from telling the truth to prosecutors." (Mem. Supp. Defs.' Post-Trial Mot. at 12.) That statement mischaracterizes both the law and the evidence. The duty to inform prosecutors of material, exculpatory evidence rests with police officers, not witnesses. Thus, defendants cannot procure a misidentification, conceal that fact from the prosecutor, and then escape liability for doing so as long as they take no further action to prevent the witness from revealing the truth. Even if that were the law, the evidence in this case would still be sufficient to support the verdict as Rounds testified that defendants told him he would be charged with perjury or contempt if he told the prosecutor the truth about the lineup. (R. at 194.)

testified that he was "in and out" of the lineup (id. at 868-69, 873-75), and the police lineup report indicates that McCabe was present at the lineup (id. at 396). That testimony is ample support for the inference that defendants were the officers who influenced Rounds' identification.

Finally, the evidence does not support defendants' contention that Newsome could have discovered the problems with Rounds' identification through the exercise of due diligence. Prior to 1999, Rounds repeatedly denied that the officers had influenced his identification. (Id. at 213-14, 218-19, 713-15, 897-99.) Moreover, during this trial, he said that he believed he would be charged with contempt or perjury if he recanted his identification. (Id. at 194.) Given that evidence, there is no reason to believe Rounds would have told the truth to Newsome's counsel in 1979. The only other people who knew what happened at the lineup were the defendants themselves. And they, as plaintiff points out, "were not going to admit that they had rigged the lineup, no matter how aggressive Newsome's lawyer was in cross-examining them." (Pl.'s Resp. Defs.' Post-Trial Mot. at 9.) In short, the evidence was sufficient to support a finding that the information defendants concealed was not otherwise available to Newsome.

Even if there is evidence that they suppressed information, defendants say that there is no evidence that the information they suppressed was material or exculpatory. Evidence is material, the jury was instructed, "if it could reasonably be taken to put the entire criminal case in such a different light as to undermine one's confidence in the verdict." (R. at 1134.) Evidence is exculpatory, the jury was told, "if there is a reasonable probability that the result of the criminal proceedings would have been different if the evidence had been disclosed to the defense." (Id.) Rounds was only one of three witness who linked Newsome to the murder. Thus, defendants say, even if the jury knew that the police had encouraged him to identify Newsome, Newsome would still have been convicted.

Once again, the Court disagrees. As the lawyer who prosecuted Newsome for the Cohen murder admitted, that case "rose or fell on the eyewitness identification[s]." (Id. at 916.) If the police improperly influenced Rounds' identification, then the integrity of the other two identifications, indeed, of the entire investigation, is called into question. The jurors knew that Newsome's fingerprints were not found at the murder scene. If they had also known that the police had tampered with Rounds' identification, there is a reasonable probability that they would have discounted the other two identifications and would have acquitted Newsome of Cohen's murder.

There was also sufficient evidence for the jury to conclude that defendants acted deliberately. In addition to coaching Rounds, there was evidence that defendants influenced Nash's identification by pointing to Newsome, influenced Williams' identification by showing him Newsome's photo before he viewed the lineup, and ignored the identifications that Rounds and Nash made from mug books that did not contain Newsome's photo. In other words, there was sufficient evidence to support the jury's finding that defendants deliberately engaged in a pattern of misconduct to deprive Newsome of his constitutional rights.

In sum, the evidence adduced at trial was sufficient to support the verdicts against both defendant McCabe and defendant McNally. Defendants' motion for judgment as a matter of law and their motion for a new trial on the grounds that the verdicts are against the weight of the evidence are, therefore, denied.

In the alternative, defendants seek a new trial on the grounds that the Court's erroneous evidentiary rulings deprived them of a fair trial. Among the evidence the Court should not have admitted, defendants say, is: (1) evidence about the murder investigation that defendants did not suppress; (2) evidence about Newsome's pardon; (3) evidence that Dennis Emerson was the real killer; (4) the expert testimony of Dr. Wells; (5) evidence about defendants' conduct during a prior

investigation; (6) evidence about the defendants' failure to disclose exculpatory evidence to the prosecutor during Newsome's motion to quash his arrest; and (7) a full-scale model of Newsome's jail cell. The Court will address each ruling in turn.

## Evidence That Was Not Suppressed

Defendants say that the Court erroneously admitted evidence concerning: (1) defendants' investigation of the fingerprints found at the murder scene; (2) their failure to investigate Nash and Rounds' identification of photos from mug books that did not contain Newsome's picture; and (3) Williams' identification of Newsome from a photo array before he viewed the live lineup. In defendants' view, that evidence, which was disclosed to or was otherwise available to Newsome before his trial, is irrelevant to his due process claims.

Defendants take too narrow a view of relevance. To prevail on his claims, Newsome had to prove that defendants deliberately deprived him of his constitutional rights. Evidence that defendants could have further investigated the fingerprints and the mug book identifications, but did not, and should not have shown Newsome's photo to Williams before he viewed the lineup, is highly relevant to defendants' state of mind. Certainly, the jurors could have concluded that defendants' failure to investigate was reasonable or was the result of carelessness. But they also could have concluded that defendants made a deliberate decision to avoid lines of inquiry that might uncover exculpatory evidence, making it more likely that they also tampered with eyewitness identifications. Because this evidence could tend to prove that defendants deliberately deprived Newsome of his constitutional rights, it is relevant to his claims.

Moreover, any risk that this evidence would "suggest[] to the jury that Defendants had a constitutional duty to . . . discover . . . all evidence tending to exonerate Plaintiff" (Mem. Supp.

Defs.' Post-Trial Mot. at 19) was cured by jury instructions. (See R. at 1134 (jury instructed that "[v]iolation of police department regulations" and "a police officer's failure to pursue scientific tests or similar investigative leads" do not "in and of themselves give rise to a constitutional violation").) Because this evidence was highly probative of defendants' state of mind and any risk of prejudice was cured by jury instructions, it was properly admitted.

## Evidence About Emerson and Newsome's Pardon

Evidence that Dennis Emerson was the real killer and about Newsome's pardon was also properly admitted. There is no dispute that the man who murdered Mickey Cohen, who was not wearing gloves, picked up a number of items from around the store, deposited them on the counter, and left them there when he fled the scene. (Id. at 357, 416-17.) There is also no dispute that fingerprints found on those items belonged to Dennis Emerson, who, at the time of the Cohen murder, was wanted for another armed robbery and murder on the south side of Chicago. (Id. at 320-330, 429.) Though Emerson has never been convicted of, nor has he confessed to, Cohen's murder, the chances that he was not the killer, but had been in Cohen's store sometime before the crime and touched the very same bottle of soda, quart of milk, snack cake, box of Hamburger Helper, and banana that the killer touched are infinitesimally small; so small, that they prompted the governor of the State of Illinois to pardon Newsome on the grounds of innocence. Under the circumstances, the assumption that Emerson was the real killer is a valid one.

Even if it is proper to assume that Emerson is the murderer, defendants say that evidence about him still should have been excluded because it is not relevant to the due process claim and would encourage the jury to impose liability regardless of fault. The Court disagrees. Defendant McNally testified, based on his thirty-one years of experience as a police officer, that criminals tend

-8-

to commit the same kinds of crimes over and over again, and tend to do so in the same general area. (Id. at 437-38, 440.) The defendants knew that Newsome's prints were not on the several items handled by the killer. Yet, they did not try to determine how many black men matching the description of the Cohen killer were wanted for murder and armed robbery on the south side of Chicago. (Id. at 438.) In light of that testimony, evidence that Emerson matched the description of the Cohen killer and was wanted for armed robbery and murder on the south side of Chicago at the time of the Cohen murder (id. at 439) could be considered by the jury in determining whether the defendants intentionally manipulated eyewitness identifications in order to close a case.

Moreover, we do not believe that the admission of that evidence encouraged the jury to impose liability without fault, given the jury instructions in this case. Among other things, the jury was told that: (1) defendants could only be held liable for a constitutional deprivation; (2) not every injury inflicted by a police officer constitutes such a deprivation; and (3) no deprivation occurred if Newsome's injury was the result of reasonable conduct, an accident, carelessness, or any other innocent reason. (Id. at 1130-31.) In short, the probative value of the Emerson evidence outweighed any possible prejudice to defendants. Accordingly, we believe that it was properly admitted.

It was also proper to admit evidence about the pardon. The issue in this case was not, as defendants point out, whether Newsome was guilty or innocent of the crime. But that is what it would have become if the fact of Newsome's innocence – and it was a fact once he was pardoned, see People v. Chiappa, 368 N.E.2d 925, 926 (Ill. App. Ct. 1977) (stating that "the guilt of the defendant is absolved by pardon . . .where the same states that it is based upon the innocence of the defendant") – had been kept from the jury. Excluding that evidence would have been highly prejudicial to Newsome. It would have invited the jurors to draw the impermissible inference that he was actually guilty, and, thus, absolve defendants of any misconduct. Admission of this evidence

was not, however, prejudicial to defendants. As we noted above, any temptation the jurors may have had to impose liability without fault was vitiated by the jury instructions. (See R. at 1130-31.) Accordingly, there was no error in the admission of this evidence.

**Expert Testimony**

Defendants also challenge the admission of Dr. Gary Wells' expert testimony. Dr. Wells is widely recognized as one of the leading experts in the United States on eyewitness identification and misidentification. He has written and published extensively on these subjects and, as defendants concede, is qualified as an expert in this field. (10/15/01 Hr'g Tr. at 57; see R. at 27-34.)

In summary, Wells testified as follows. First, he said extensive research shows that witnesses who see a lineup in which the perpetrator is not present and on whom no external influence is brought to bear, make a relative best choice; that is, they choose the lineup member that most resembles the perpetrator. (Id. at 35-37.) This, he said, is called the "natural error." (Id.) To determine whether the witnesses in this case made the natural error when they chose Newsome from the lineup, Wells conducted a study using photographs of Emerson and the lineup. (Id. at 39-40, 42-44.) He showed a photograph of Emerson to each person for fifteen seconds. Then he took the photo away and showed each person the photos of the Newsome lineup and asked them to pick from the lineup the person they just saw in the photograph. (Id. at 42-46.) In the first phase of this study, Wells used an undated photo of Emerson and showed it to 50 people. (Id. at 42- 44.) In the second phase, he used a photo of Emerson dated February 12, 1980, roughly three months after the murder, and showed it to 500 more people. (Id. at 40, 42, 47.) According to Wells, none of the first 50 people and only 15 of the subsequent 500 people in the study, or 3%, chose Newsome from the lineup after seeing a photo of Emerson. (Id. at 51-52.) Wells said he used the chi-square statistic

to determine the error rate of his study and found that the chance the pattern he observed was due only to chance was less than 1 out of 1,000. (Id. at 50-51.) Because only 3% of the study subjects chose Newsome for Emerson and, as a statistical matter, it was extremely unlikely that those results were due to chance, Wells concluded that the witnesses' misidentification of Newsome was not a natural error of misidentification, but was the product of external influence. (Id. at 57-58.) Finally, Wells said, though the chance that any 1 of the 3 witnesses chose Newsome without external influence was 3% or 3 out of 100, the chance of all three witnesses choosing Newsome for Emerson without external influence was approximately 1 out of 37,000 ((3 out of 100 x 3 out of 100) x 3 out of hundred = 27 out of 1 million or 1 out of 37,000). (Id. at 52-57.)

Defendants contend that Wells' testimony should have been excluded because it does not comport with Daubert v. Merrill Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993). According to Daubert, a witness qualified as an expert should be allowed to testify only if his testimony consists of "(1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." Id. at 592. Among the factors to be considered in determining whether expert testimony is admissible are: (1) "whether a theory or technique . . . can be (and has been) tested"; (2) "whether the theory or technique has been subjected to peer review and publication"; (3) "the known or potential rate of error"; and (4) whether the theory or technique has achieved "[w]idespread acceptance." Id. at 593-94. The focus of the inquiry, according to the Daubert Court, "must be solely on principles and methodology, not on the conclusions that they generate." Id. at 595.

Defendants' argument centers on the first element of Daubert. They contend that Wells' testimony did not consist of scientific knowledge because: (1) his opinion is based on the unsupported assumption that Emerson is the real killer; (2) he used an untested methodology; (3) he

compared his test results to a scientifically unproven norm; and (4) he provided no indication of the error rate. (Mem. Supp. Defs.' Post-Trial Mot. at 24.)

The first contention is easily dispatched. As discussed above, Dr. Wells' assumption that Emerson was the real killer is amply supported by the evidence in this case. Moreover, defendants' argument that it is not goes to the weight of his testimony not its admissibility. Defendants were free to, and did, point out on cross-examination that Wells' conclusions were premised on the unproven assumption that Emerson was the killer. (R. at 61.) That, however, is an attack on the validity of Well's conclusion, not on the science behind it.

Defendants' second contention, that Wells used a scientifically untested methodology, is also refuted by the record. Wells testified that the method he used – showing people a photo of a perpetrator, taking the photo away, and asking them to choose the perpetrator from a photo array – is an accepted method of researching eyewitness identifications and has been used in numerous published, peer-reviewed studies. (Id. at 47-48.) Despite this testimony, defendants assert that Wells' methodology is unsound because there is no evidence that *his* study – in defendants' words, "an initial survey of 50 persons with an undated photograph of Emerson and then a survey of 500 persons with a photograph of Emerson dated four months after the murder" (Mem. Supp. Defs.' Post-Trial Mot. at 24) – was subject to peer review. Daubert, however, does not require Wells to demonstrate that this exact study has been scrutinized, and is accepted, by the psychological community. Rather, it requires him to show that "the reasoning or methodology underlying [it] is scientifically valid." Daubert, 509 U.S. at 592-93. That he did. (R. at 47-50.) The fact that the photos Wells used may not have accurately depicted Emerson's appearance on the day of the crime may undermine the credibility of his conclusions or provide a rich field for cross-examination. The

defendants argued this very point in their closing. (Id. at 1095-97.) It does not, however, invalidate his methodology.

The Court is also not persuaded by defendants' claim that Wells compared his test results to a scientifically unproven norm. The norm Wells used was the natural error of misidentification, which he said occurs when witnesses pick the lineup member that most resembles the perpetrator. (Id. at 35-37.) According to Wells, the natural error principle was derived through the scientific method and is accepted by members of his discipline (id. at 30-32, 35-37), testimony that refutes defendants' claim.

Defendants' last contention, that Wells gave no indication of the error rate, is also contradicted by the record. Wells testified that he used the chi-square statistic to calculate the error rate of his study, i.e., the likelihood that the results he obtained did not actually reflect a pattern of choices but were due simply to chance. (Id. at 50-51.) That statistical analysis, Wells said, indicated that the chance the pattern he observed was due solely to chance was less than 1 out of 1,000. (Id. at 51.) Thus, defendants' concern about the error rate is unfounded.

Wells' testimony also comports with the Supreme Court's opinion in General Electric Co. v. Joiner, 522 U.S. 136, 146 (1997) (noting that focus of Daubert inquiry should be on methodology, but saying that expert testimony should be excluded if "there is . . . too great an analytical gap between the data and the opinion proffered"). In Wells' study, only 15 of 500 subjects, or 3%, chose Newsome for Emerson as the result of natural error. Wells tested those results for error and concluded that the chance his results were due merely to chance was less than 1 out of 1,000. Because the error rate was low, Wells concluded that his results were reliable and that the chance of any one witness choosing Newsome for Emerson due to natural error was 3% or 3 out of 100, the chance of 2 witnesses doing so was 9 out of 10,000, and the chance of 3 doing so was 27 out of

1,000,000 or 1 out of 37,000. Given those numbers, Wells opined that Rounds, Williams, and Nash had not made the natural error, but chose Newsome because of external influence. There is no gap between that data and Wells' opinion, which, despite defendants' efforts, the jury apparently credited.

Wells' testimony also meets the second requirement of <u>Daubert</u> because it helped the jury determine a fact in issue. The jury knew that Newsome had been misidentified as Cohen's killer because he was innocent of the crime. The question they had to answer was why. In other words, did each of the witnesses make a good-faith mistake or did the defendants tamper with their identifications? Wells' testimony about: (1) how identification errors generally occur; (2) how they occurred in his study; and (3) the kinds of actions that can influence identifications was helpful to answering that question.

In sum, Wells is an admitted expert in the field of eyewitness identification, his methodology is generally accepted in his field and has been subjected to peer review, and his study has an error rate of less than 1 out of 1,000. Moreover, his data fully support his conclusions and his testimony helped the jury resolve a key issue in the case. Because Wells' testimony constitutes scientific knowledge that was helpful to the jury, it is admissible within the meaning of <u>Daubert</u>.

## Evidence About the Defendants' Prior Conduct

When he was questioned by plaintiff's counsel, defendant McNally said that he had no independent recollection of the Newsome lineup, but that he "wouldn't rig a lineup." (R. at 407-08.) When defense counsel questioned him, however, he said affirmatively that neither he nor McCabe had in any way encouraged any of the witnesses to identify Newsome. (<u>Id.</u> at 479.) On redirect, when plaintiff's counsel asked McNally if he actually remembered that he did nothing improper at

the lineup or if he said he had not because he never would have done such a thing, McNally said it was the latter. (Id. at 489.) Based on this testimony, the Court allowed plaintiff to introduce evidence that he and defendant McCabe had, on a prior occasion, shown a photo of a murder suspect to a witness before the witness viewed and identified the suspect from a lineup. (Id. at 890-92.)

Defendants argue that this evidence should have been excluded because it was not impeaching. In their view, McNally's admission that he and McCabe had, in another investigation, shown a photo of a murder suspect to a witness before the witness viewed a lineup does not constitute rigging a lineup. As such, defendants say, it does not impeach his testimony that he would never do such a thing.

The Court disagrees. Defendant McNally testified that it was not proper procedure to show a photo array to a witness who was going to view a lineup. (Id. at 405-07.) Wells testified that showing the suspect's photo, singly or in an array, to a witness before she views a lineup can influence the witness' lineup identification. (Id. at 37-38.) Given that evidence, McNally's admission that defendants had, in a previous investigation, shown a photo of a suspect to a witness before the witness viewed a live lineup impeaches his testimony that he "wouldn't rig a lineup." The prior conduct evidence was, therefore, admissible.

### Evidence that Defendants Did Not Disclose Evidence During Motion to Quash

Over defendants' objection, the Court allowed plaintiff's counsel to question Mr. Lippner, one of the state's attorneys assigned to the Cohen murder case, about the timing of defendants' disclosure of the circumstances surrounding Williams' identification of Newsome. Plaintiff was trying to show that defendants did not voluntarily tell the prosecutors that Williams had viewed a photo array before he made his lineup identification. Rather, they admitted their actions only after

Williams testified about them in a June 1980 suppression hearing. Evidence that defendants were, in essence, forced to disclose the circumstances surrounding Williams' identification certainly would have been admissible because it bears on their state of mind.

The admissibility question is, however, moot because no such evidence was actually elicited from Mr. Lippner. When plaintiff's counsel asked him whether defendants disclosed the circumstances surrounding Williams' identification at the hearing on Newsome's motion to quash his arrest, he said he did not recall. (Id. at 925.) Lippner also said he did not recall whether Williams testified during that hearing, let alone whether he did so before defendants, and, thus, was the first to mention the photo array. (Id. at 926-27.) In fact, Lippner said nothing from which the jury could infer that defendants reluctantly or belatedly disclosed this evidence to him. As a result, defendants could not have been prejudiced by his testimony.

### Full-Scale Model of Newsome's Jail Cell

Defendants' last evidentiary challenge is to the Court's decision, during the damages phase of the case, to allow the jury to view briefly a full-scale model of Newsome's jail cell. Defendants say that decision was erroneous because the model, which contained no bedding or personal items, did not accurately depict Newsome's cell and that it impermissibly invited the jury to determine damages by "put[ting] themselves in Plaintiff's shoes." (Mem. Supp. Defs.' Post-Trial Mot. at 28.)

The Court disagrees with both propositions. The most critical feature of the cell exhibit was its size, which defendants admit was accurate. (Id. at 27.) Though the model contained no bedding or personal items, any risk of erroneous inference that might have arisen from their absence was eliminated when defense counsel told the jury that Newsome had such items in his cell. (R. at 1191-92.) Defendants could have, but did not, question Newsome about the contents and conditions of

-16-

his cell. Therefore, they cannot complain now about a perceived defect that they could have cured at trial.

Moreover, the model was not inflammatory. The model, unlike an actual jail cell, was in pristine condition: clean, odorless, and unblemished. Nor was it an invitation to the jury to put itself in Newsome's place. It was simply a demonstrative exhibit that provided a context for Newsome's testimony about the suffering he endured in prison. The jury was only permitted to view the model for approximately ten minutes. Each side was permitted to briefly summarize its appearance. The model was then taken away and never seen again by the jury. For all of these reasons, we believe the cell model was properly admitted.

## Newly Discovered Evidence

After the trial, defendants discovered that Newsome had been arrested in Minnesota shortly before the trial for possession of heroin with intent to deliver. According to defendants, that information, coupled with the facts underlying his 1999 drug conviction, is admissible evidence that Newsome is involved in an ongoing criminal enterprise. That evidence, they say, could have been used "to attack Plaintiff's credibility," and thus, entitles them to a new trial. (Supp. Mem. Supp. Defs' Post-Trial Mot. at 3.)

Impeachment evidence does not, however, constitute grounds for a new trial. Mumford, 814 F.2d at 330. Moreover, even if it did, only admissible impeachment evidence would carry the day. Id. As a general rule, only the fact of a conviction, not the facts underlying it, are admissible to impeach. FEDERAL RULE OF EVIDENCE 609(a); see Campbell v. Greer, 831 F.2d 700, 707 (7th Cir. 1987) (noting that "opposing party may [not] . . . parade [the witness' crime] lovingly before the jury in all its gruesome details," but is limited to introducing "the crime charged, the date, and the

disposition"). Similarly, evidence about arrests and other prior misconduct are not admissible for impeachment purposes unless they bear on a witness' truthfulness. FEDERAL RULE OF EVIDENCE 608(b); United States v. Miles, 207 F.3d 988, 993 (7th Cir. 2000) (noting that not all misconduct suggests untruthfulness); United States v. DeStefano, No. 94 CR 116, 1995 WL 398763, at *7-8 (N.D. Ill. June 29, 1995) (excluding extrinsic evidence of witnesses' drug arrests under Rule 608(b) because they did not "involve[] dishonesty"). Thus, evidence about the facts underlying Newsome's 1999 conviction and about his 2001 arrest are not admissible to prove that he is not worthy of belief.

Defendants argue, however, that they would use this evidence not to attack Newsome's character generally, but to impeach his testimony that, apart from the wrongful murder conviction, he was an upstanding citizen who had no difficulties with the law. The problem with this argument is that Newsome never actually said that. He did not testify that he had not had any problems with the law since his release from prison. Nor did he say that he had not used, possessed or sold drugs in that time. On the contrary, he admitted that he was convicted in 1999 for possession of illegal drugs. (R. at 546.) Moreover, though plaintiff's counsel may have tried to portray him as a model citizen, Newsome's actual testimony supports the less flattering inference that he was a rootless young man who, after adapting to the chaos and brutality of prison life, was having difficulty returning to "normal" life and had recently been convicted of a drug offense. (See id. at 546, 1236-70.) Because Newsome never testified that the Cohen murder conviction was the only blemish on an otherwise exemplary life, and that is not the only conclusion that can be drawn from his testimony, neither the facts underlying his 1999 conviction nor his 2001 arrest would impeach his testimony.[2]

---

[2]If the facts underlying his 1999 conviction or his 2001 arrest evidenced gang membership that evidence might be impeaching because Newsome testified at length about his refusal to join a

Defendants also contend that this evidence could have been used "to rebut Plaintiff's claims of damages caused by the stigma of his incarceration." (Supp. Mem. Supp. Defs' Post-Trial Mot. at 3.) That stigma, Newsome testified, makes him reluctant to tell people about his prison experience and fearful that when he does it will scare them away. (R. at 1265-66.) Even if, as defendants assert, Newsome's recent legal problems suggest that he is involved in a continuing criminal enterprise, that evidence would not rebut his claim that he believes disclosure of his fifteen-year prison stay will adversely impact his personal relationships.

Even if it did, it would still not win defendants a new trial because this evidence is not likely to have changed the outcome of the proceeding. See Mumford, 814 F.2d at 330 (new trial motion should be granted only if newly discovered evidence "is likely to change the outcome"). The bulk of Newsome's damage testimony was devoted to the suffering he endured in prison, testimony that the proffered evidence does not rebut. Because the result of the trial would likely have been the same even if this evidence had been admitted, it does not provide a basis for granting defendants' motion.

Defendants also say that they should have been able to introduce evidence that Newsome purchased a $53,000 car the same year that he reported just over $17,000.00 in adjusted gross income to the Internal Revenue Service. Even if this were highly relevant evidence, and it is not, it would not warrant a new trial. To succeed on their motion, defendants must show that this "newly discovered evidence" was not available to them before trial through the exercise of due diligence. Id. They have made no showing that they requested information about Newsome's automobile

---

gang in prison and the hardships he endured because of it. But his 1999 conviction and subsequent arrest suggest that he uses or sells drugs, not that he belongs to a gang.

purchases or spending habits during discovery or that this information was otherwise unavailable to them. Absent that showing, the "discovery" of this evidence is not grounds for a new trial.

Finally, defendants say that Newsome neglected to tell them that he had received unemployment benefits in 2001, information they would have used to bolster their impeachment of Newsome with his post-release criminal conduct. As discussed above, however, further evidence of his recent legal problems is inadmissible and impeachment evidence does not, in any event, advance defendants' cause. Moreover, outside of impeachment, this evidence has no relevance. Newsome did not, for example, claim that he had lost wages because of his checkered past, or that the murder conviction made him ineligible for government benefits. As such, the fact that he received unemployment benefits, even if it was concealed from defendants, does not provide a basis for a new trial.[3]

---

[3] In their opening memorandum, defendants also argued that Newsome had not disclosed his move to Minnesota to them, an omission that deprived them of impeachment material. Impeachment evidence, of course, is not grounds for a new trial. Mumford, 814 F.2d at 330. Even if it were, defendants waived this argument by failing to include it in their supplemental memorandum on newly discovered evidence. Finally, even if they had not waived this argument and it could provide a basis for a new trial, it would still be unavailing as Newsome's Minnesota address, which was listed in the final pretrial order, was available to defendants before the trial.

## Conclusion

For the reasons set forth above, defendants' Rule 50(b) motion for judgment as a matter of law, or in the alternative, Rule 59(a) motion for a new trial is denied. This is a final and appealable order.

ENTER:

**UNITED STATES DISTRICT JUDGE**

DATED: 4-2-02